11th Court of
Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Sammie Luckus Cook, Jr.

Appellant

Vs.                   No. 11-01-00386-CR -- Appeal
from Dallas County

State of Texas

Appellee

 

The jury convicted Sammie Luckus Cook, Jr. of
aggravated sexual assault.  The jury
also found that appellant used a deadly weapon during the commission of the
offense and assessed his punishment at confinement for life and a fine of
$10,000.  We affirm.

                                                                   Points
of Error

Appellant presents seven points of error.  First, appellant argues that the trial court
erred:  (Point 1) by failing to define Areasonable doubt@ in its charge to the jury;
and (Point 2) by denying his motion for continuance.  Next, appellant argues: 
(Point 3) that the evidence was Alegally
insufficient@ to prove
that the knife was a deadly weapon; (Point 4) that the evidence was Afactually insufficient@ to prove that the knife
was a deadly weapon; and (Point 5) that the evidence was Afactually insufficient@ to prove identity.  Finally, appellant argues that the trial
court erred:  (Point 6) by instructing
the jury that Aintent
may be inferred from acts done, words spoken, or both@; and (Point 7) by failing to make a proper
determination on the admissibility of extraneous offense evidence at the
punishment phase of trial.

                                                                   The
Indictment

The indictment charged that, on or about April 13,
2000, appellant unlawfully caused the penetration of the female sexual organ,
anus, and mouth of Virginia Smith (pseudonym). 
The indictment also charged two prior felony convictions.

                                                                Proof
of Indictment








The first witness was Virginia Smith.  That was not her true name, but she
testified that it was the name which she wanted to go by for this trial.  At the time of the offense, Virginia Smith
lived in an apartment complex in Dallas. 
Virginia Smith testified that April 13, 2000, was a day that she will
never forget.  She got to her apartment
about 5:30 p.m., changed clothes, and went to check the mail.  When she got back to the apartment, she
opened the patio door and started cleaning the kitchen.  While she was putting up the dishes, she
heard a noise from the patio.  Then she
saw a man standing in her living room. 
She made a positive identification of appellant as the man who came into
her apartment and assaulted her.  

Virginia Smith said that she asked appellant what
he wanted and that he kept telling her to Ashut
up.@  Virginia Smith testified that appellant
grabbed her by her arm and pulled her into her bedroom.  Then he took her into the bathroom.  Appellant closed the bathroom door, and
Virginia Smith could hear him in the kitchen going through the drawers.  When he came back to the bathroom, appellant
had Virginia Smith=s
purse and a knife.  He told her to give
him all the money that she had. 
Virginia Smith said that appellant had the only sharp knife which she
had in the apartment.  After he took all
the money from her purse, appellant told Virginia Smith to get undressed.  Virginia Smith started crying, and appellant
poked her with the knife until she complied with his demand.  Virginia Smith identified the pictures which
showed the way she looked when the police came to her apartment later that
night. 

The first sexual assault was in the bathroom when
appellant forced Virginia Smith to put his penis in her mouth.  Appellant told her not to bite him, and he
said that he would kill her if she bit him. 
He put the knife to her throat. 

The second sexual assault alleged in the
indictment occurred when appellant got on top of Virginia Smith in the bedroom
and penetrated her vagina with his penis. 
He had been poking her with the knife, and he rubbed the knife against
her after he got on top of her. 
Virginia Smith said that she could smell alcohol while appellant was on
top of her.  Virginia Smith said that
appellant told her that he would kill her if she told anyone what happened or
if she called the police.  Virginia
Smith said that appellant told her that he would always be able to find her and
that she would not be able to hide. 
Then he tried to kiss her, and he got mad when she would not return the
kiss.        








          The third sexual
assault charged in the indictment was when appellant told Virginia Smith to
turn over and lie on her stomach. 
Appellant asked for Vaseline or lotion and then told her that it was her
fault if it hurt and that she had better not scream.  Appellant was running the knife down Virginia Smith=s back, side, and arm.  Some of the exhibits showed the cuts he
made.  Virginia Smith said that
appellant made penetration of her anus with his penis and that it hurt. 

There was a fourth sexual assault.  Appellant laid on the bed on his back and
made Virginia Smith get on top of him. 
Appellant still had the knife, and he was poking her until she did what
he wanted.  Virginia Smith said that she
Ajust wanted it to be
over with.@  Appellant was calling her names, and his
penis penetrated her vagina.  

Appellant then put Virginia Smith back into the
bathroom and told her to stay there. 
Virginia Smith waited 10 or 15 minutes to make sure that he was
gone.  Then she got dressed and ran to
her friend=s apartment
in the next building.  The friend was
not there, but the friend=s
mother and daughter let Virginia Smith into their apartment.  They called A9-1-1"
for her, and the police came to her apartment. 


There was also testimony by several police
officers.  That testimony documented the
crime scene, the chain of custody of items found at the scene, and pictures
which were made of Virginia Smith and of her apartment on the night of the
offense.  One of the officers also testified
that, at a later date, Virginia Smith picked appellant=s picture from a photographic array.  There was also expert witness testimony for
both the State and the defense.








The State=s
expert witness was Tim Kalafut, Ph.D. 
He testified that he was employed by Southwestern Institute of Forensic
Sciences (SWIFS) as a forensic biologist, and he explained  ADNA@ profiling and ASTR@ analysis for the jury.  DNA is the acronym for Adeoxyribonucleic acid.@ STR is the acronym for Ashort tandem repeat.@  Dr. Kalafut explained that DNA is Apackaged@ in chromosomes and that
each person has 23 pairs of chromosomes. 
These are the Ablueprints@ for the body, and they
determine everything about a person. 
Half of each pair comes from the person=s
mother, and the other half comes from the person=s
father.  Dr. Kalafut said that we have Alittle repeating units@ of DNA which are measured
by the STR.  DNA can be used for many
purposes, and one of those purposes is for the identification of the person who
has a particular DNA.  Dr. Kalafut said
that statistical calculations can be generated to show the strength of the
match and that STR analysis is Acurrently
the state-of-the-art DNA testing, worldwide.@  Dr. Kalafut testified that DNA from sperm
cells on clothing sent to SWIFS from Virginia Smith=s apartment was a positive match with DNA
taken from appellant. Dr. Kalafut said that the sperm cells from Virginia Smith=s clothing were Aa match,@ that they were Aidentical,@ and that they were Athe same DNA profile.@  

Dr. Kalafut=s
report was admitted into evidence, and it shows that the Aprobability of selecting at
random@ an unrelated
African-American individual with the same DNA as that found on Virginia Smith=s clothing was Aone in 301 billion.@  Dr. Kalafut then said that the total population of the entire
earth was Aaround
six-and-a-half billion people.@

After the State rested, appellant=s trial counsel called
Amber Moss as the only witness for the defense.  Moss testified that she is a forensic scientist who is employed
by Genescreen and that Genescreen is a DNA laboratory.  Moss was critical of the protocol used by
SWIFS.  Moss said that SWIFS used
readings below the standard suggested by the manufacturer of the machine.  Moss said that her DNA tests did not show a
match for appellant, that she tested samples which were given to her by SWIFS,
that she used the same kind of kit and machine that SWIFS used, and that she
did not use readings below the standard suggested by the manufacturer.  During cross-examination, Moss agreed that
the manual for the machine which both she and SWIFS used contained the
statement: APeak
heights less than 150 RFU should be interpreted with caution.@  (Emphasis added)  She also
agreed that the manual does not say that 150 RFU is the minimum and that it
does not say that 150 RFU or more is mandated. 
When she was asked to review the report from Dr. Kalafut, she agreed
that it showed above 150 RFU on the tests which he made in this case.  Moss agreed that, if she had gotten the same
results as Dr. Kalafut, she would have said that it was a Agood match.@

                                                          Proof
at Punishment Phase

Six other victims of aggravated sexual assaults
testified at the punishment phase of trial. 
There was DNA evidence from each of those assaults which matched the DNA
evidence from appellant.  These
witnesses will be identified by the pseudonyms which they used during trial or
by initials.  








AAmy
Harrison@ testified
about events on February 15, 1995, when she was subjected to two acts of
aggravated sexual assault by an unknown man. 
The police took her to Parkland Hospital for the rape kit
examination.  AMary Smith@
testified about events on December 18, 1995, when she was subjected to an
aggravated sexual assault by an unknown man. 
The police took her to Parkland Hospital for the rape kit
examination.  M.C.R. testified through
an interpreter about the events on March 28, 1996, when she was subjected to an
aggravated sexual assault by an unknown intruder (in the presence of her
five-year-old daughter).  The police
took her to the hospital for an examination. 
AJoanna Smith@ testified about events on
May 7, 1996, when she was subjected to a series of aggravated sexual assaults
by an unknown intruder.  The police took
her to Parkland Hospital for the rape kit examination.  ABeth
Smith@ testified about
the events on May 19, 1996, when she was subjected to a series of aggravated
sexual assaults by an unknown intruder. 
The police took her to the hospital for a rape kit examination.  

AMary
Becker@ testified
about the events on May 6, 2000.  These
events occurred 23 days after the offense for which appellant was
convicted.  After he committed several
acts of aggravated sexual assault, appellant fell asleep in Mary Becker=s apartment.  Appellant was arrested after she was able to
escape and call the police.  The police
took her to the hospital for the rape kit examination.  The police detective put appellant=s photograph into the
photographic lineup which he showed to Virginia Smith. 

There was testimony by the police officers who
arrested appellant at Mary Becker=s
apartment, and there was testimony by Dr. Kalafut that DNA evidence from the
sexual assaults of all six witnesses matched appellant=s DNA evidence.

                                                     Definition
of AReasonable Doubt@

Appellant argues in his first point that the trial
court erred in failing to define Areasonable
doubt@ in its charge
to the jury.  See Paulson v. State, 28
S.W.3d 570, 573 (Tex.Cr.App.2000), where the court specifically overruled that
portion of Geesa v. State, 820 S.W.2d 154 (Tex.Cr.App.1991), which required the
trial courts to instruct juries on the definition of Abeyond a reasonable doubt.@  The court also said in Paulson v. State, supra at 573:

It
is ill-advised for us to require trial courts to provide the jury with a
redundant, confusing, and logically-flawed definition when the Constitution
does not require it, no Texas statute mandates it, and over a hundred years of
pre-Geesa Texas precedent discourages it.

 








Appellant argues that Paulson v. State, supra,
should not apply to the trial of his case because the offense for which he was
indicted occurred before the date of the opinion in that case.  We disagree.  The procedural change in Paulson v. State, supra, applies to all
trials subsequent to the opinion in that case. 
See Taylor v. State, 10 S.W.3d 673, 683 (Tex.Cr.App.2000).  Point of Error No. 1 is overruled.  

                                                              Denial
of Continuance

Appellant argues in his second point that the
trial court erred by overruling his motion for continuance.  The trial of this case began on September
10, 2001, and the World Trade Center was bombed on September 11.  One of appellant=s witnesses was unable to fly from El Paso to
Dallas to attend trial and testify. 
That witness would have testified as an expert witness  Aabout
issues such as stress...and how it affects the complainant=s ability to perceive her
attacker.@  Appellant moved for continuance pursuant to
TEX. CODE CRIM. PRO. ANN. art. 29.06 (Vernon 1989) on the basis that Aidentity is the only
contested issue.@  Appellant has not shown an abuse of
discretion by the trial court in overruling his motion for continuance.  The record does not show the Afacts which are expected to
be proved by the witness@
or that the Afacts set
forth in said motion were probably true.@  There was not only eyewitness identification
of appellant, but there was also DNA evidence which identified appellant beyond
any reasonable doubt.  This record does
not show that appellant Awas
actually prejudiced by the denial of his motion.@  See Janecka v. State, 937 S.W.2d 456, 468
(Tex.Cr.App.1996), cert. den=d,
522 U.S. 825 (1997).  Point of Error No.
2 is overruled.

                                                             Sufficiency
of Evidence








Appellant=s
claim under Point of Error No. 3 that the evidence was Alegally insufficient@ to prove that the knife was a deadly weapon
has been reviewed under the test stated in Jackson v. Virginia, 443 U.S. 307,
319 (1979).  Appellant=s claims under Points of
Error Nos. 4 and 5 that the evidence was Afactually
insufficient@ to prove
that the knife was a deadly weapon and to prove the Aelement of identity@ (that appellant was the man who committed the
offense) have been reviewed under the tests stated in Johnson v. State, 23
S.W.3d 1, 6 (Tex.Cr.App.2000), and Clewis v. State, 922 S.W.2d 126, 129
(Tex.Cr.App.1996).  We hold that the
evidence summarized above was both Alegally
sufficient@ and Afactually sufficient@ to prove that the knife
was a deadly weapon[1] and
that the evidence was Afactually
sufficient@ to prove
the element of identity.  Points of
Error Nos. 3, 4, and 5 are overruled.

                                                          Jury
Instruction on AIntent@

Appellant argues in his next point that the trial
court erred by instructing the jury that: 
AIntent may be
inferred from acts done, words spoken or both.@  There was no objection to this instruction.  Since there was no timely objection to the
charge, appellant must show Aegregious
harm.@  Ellison v. State, 86 S.W.3d 226
(Tex.Cr.App.2002); Almanza v. State, 686 S.W.2d 157, 171
(Tex.Cr.App.1985).  The instruction was
a correct statement of the law.  See
Dues v. State, 634 S.W.2d 304, 305 (Tex.Cr.App.1982).  Appellant=s
defense was not based upon the lack of intent; it was based upon his argument
that someone else had committed the assault. 
Appellant has not shown Aegregious
harm@ from the
instruction to the jury that intent could be Ainferred@ from acts done, words
spoken, or both.  Point of Error No. 6
is overruled.

                                                               Extraneous
Offenses

Appellant argues in his last point that the trial
court erred by failing to make a Aproper
preliminary determination@
on the admissibility of extraneous offense evidence at the punishment phase of
trial.  The record shows that, before AAmy Harrison@ (the first extraneous
offense witness) testified, appellant=s
trial counsel asked to approach the bench. 
The record shows that an off-the-record discussion was held at the
bench.  The record also shows that,
after AMary Smith@ (the second extraneous
offense witness) testified, appellant=s
trial counsel stated in open court outside the presence of the jury:

For the record, before the first witness was
called this morning, I approached the bench and made an objection to the
introduction of these extraneous offenses regarding the rape; that they hadn=t been proved beyond a
reasonable doubt.  The Court gave me a
running objection.

 








The court did make a preliminary determination on the
admissibility of the extraneous offense evidence.  The evidence which was summarized above supports the trial court=s ruling.  See TEX. CODE CRIM. PRO. ANN. art. 37.07, ' 3(a)(1) (Vernon Supp.
2003) which authorizes the trial court to admit Aany
other evidence of an extraneous crime or bad act that is shown beyond a
reasonable doubt by evidence to have been committed by the defendant.@  The DNA evidence by Dr. Kalafut was sufficient to support the
trial court=s
preliminary ruling on the admissibility of this evidence.  During the punishment phase of trial, the
court instructed the jury that:

You are instructed that if there is testimony
before you in this case regarding the defendant having committed offenses other
than the offense alleged against him in the indictment in this case, you
cannot consider said testimony for the purpose of assessing punishment, unless
you find and believe beyond a reasonable doubt that the defendant committed
such offenses.  (Emphasis added)

 

The evidence before the jury, including the DNA
testimony and proof of appellant=s
arrest while he was in the bed of AMary
Becker@ (the last
extraneous offense witness), was sufficient to support the jury=s belief beyond a
reasonable doubt that he had committed each of those offenses and to consider
those offenses for the purpose of assessing punishment.  Point of Error No. 7 is overruled.

                                                                This
Court=s Ruling

The judgment of the trial court is affirmed.

 

BOB DICKENSON

SENIOR JUSTICE

February 6, 2003

Publish.  See TEX.R.APP.P.
47.2(b).  

Panel
consists of:  Arnot, C.J., and

Wright,
J., and Dickenson, S.J.[2]

 











[1]TEX. PENAL CODE ANN. '
1.07(a)(17)(B) (Vernon 1994) defines a Adeadly
weapon@ as  including Aanything that in the manner of its use...is capable of
causing death or serious bodily injury.@ 





[2]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.